## THE MIDLAND.[1]

### JENKS et al. v. THE MIDLAND.

#### (District Court, S. D. New York. November 20, 1891.)

COLLISION — FOG — DUTY TO COME TO STAND-STILL ON HEARING WHISTLES — NAVIGATION NEAR SHORE.

The freight and passenger steam-boat J., when nearing New York in the Hudson river, ran into a fog so thick that vessels could not be seen more than 150 feet distant, and thereupon hauled in towards shore to keep in sight of the piers. The ferry-boat M., bound from Forty-Second street to Weehawken, followed her usual course, in thick fog, of keeping the line of the New York shore to Sixtieth street. Each vessel heard the whistles of the other near at hand, and both stopped their engines, but the J. did not reverse at all, and the M. not until the other vessel was seen, within 150 feet, and too late to avoid collision. *Held* that, under the circumstances, the navigation of the boats near the shore was not a fault, but in a dense fog, and with fog-signals sounding very near, and nearly ahead, it was the duty of each to come to a stand-still in the water, by reversing as soon as possible, until their respective positions were discovered. As each was in this respect chargeable with the same fault, the damages were divided.

In Admiralty. Suit for damage by collision.
*Hyland & Zabriskie*, for libelants.
*Ashbel Green*, (*Herbert E. Kinney*, of counsel,) for claimants.

BROWN, J. About 10 minutes past 9 in the morning of March 13, 1891, during a dense fog, the libelants' passenger and freight steamer S. A. Jenks, bound from Sing Sing to New York, while navigating near the New York docks, came in collision, about 150 feet outside of the slip between Forty-Fifth and Forty-Sixth streets, North river, with the ferry-boat Midland, which a few minutes before had left her slip at Forty-Second street, bound for the old ferry landing in Weehawken. It was clear weather when the Jenks left Sing Sing, and continued so until she reached Ninety-Sixth street, New York, when fog set in. The Jenks thereupon hauled in towards the shore, and reduced her speed to 5 or 6 miles per hour, and came down parallel with the piers, about 150 feet distant from them, as her officers estimate, and blowing her fog-whistle, as required. When she arrived off Forty-Ninth street one blast of the whistle was heard on her starboard bow. Her engines were there-

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

upon stopped, and so remained until collision, without backing; and signals of two blasts of the whistle were given. The Midland was soon seen through the fog, estimated at only a little over 100 feet distant on the starboard side, coming at nearly right angles, and at considerable speed, as the Jenks' witnesses assert, until she struck with her stem the starboard side of the Jenks, running under her guard, and smashing through the iron plate below, beginning about 20 feet from her stem, and extending about 25 feet aft, bending the knees, and raising a part of the guard. The witnesses for the Jenks contend that for two or three minutes before collision their own headway had been entirely checked, and that the Jenks was remaining still, parallel with the line of the shore. The Midland, on leaving her slip, was pursuing her usual course in thick fog, namely, to keep the line of the New York shore until she reached Sixtieth street. The tide was within two hours of high water. Her pilot testifies that she was brought around to a course of east north-east, parallel with the line of the shore; that he gave fog-signals, as required, and that the whistles of the Jenks were heard on his port bow, whereupon his engine was stopped; that a little afterwards the Jenks was sighted on his port bow, crossing his course from port to starboard at a considerable rate of speed, heading towards the New York shore; that, as soon as she was seen, the Midland reversed, and had got stern-way down river before collision. Her witnesses almost all agree with those of the Jenks that the collision was at nearly right angles.

There is the usual contradiction in the testimony of the witnesses in this case, but, making allowance for the prepossession of the witnesses, the liability to mistake in fog, and taking into account the testimony of disinterested witnesses, I have little doubt that the truth lies somewhat between the extreme claims of either side. It is not credible that the Midland was heading squarely towards the New York shore. There was no reason for such a course, and it is emphatically denied. But, on leaving her slip, she had got several hundred feet out in the river, and, in order to see the line of the piers, as was her custom in fog, she had to haul in towards the shore. Her course, as stated by the pilot, east north-east, was not parallel with the shore, but angling at least two and a half points towards the shore; and I have no doubt that she was headed at least that amount towards the shore at the time when she was first seen from the Jenks, and probably more. All the outside witnesses, on the other hand, state that the Jenks was also headed somewhat towards the shore at the time of the collision. The two whistles which she repeatedly gave to the Midland after hearing her fog-whistle imported that she would pass on that side, and I have little doubt that she was headed in about a couple of points. The evidence of the witnesses from the Stag, moreover, leaves no doubt that the Midland was further out in the river than the Jenks; and the fact that the Jenks' whistles, and the Jenks herself, when seen, were both on the Midland's port bow, further proves that the Midland was heading considerably towards the New York shore, probably as much as four points, at the time of collision. He intention evidently was to go between the Jenks and the shore. The square

break made through the iron plate of the Jenks, and the comparatively little damage or marks left upon the Jenks aft of that break, satisfy me that the blow was inflicted mainly by the forward motion of the Midland, rather than by the forward motion of the Jenks. But, while the Midland was moving towards the New York shore, she was also moving up river, both by the tide and by her own angle. As the tide was within two hours of high water, there must have been an upward current of at least two knots at the place of collision. The speed of the Jenks through the water could not have been wholly stopped, because there was not sufficient time for this after her wheels had been stopped, without reversing them; and because, if she had been stopped, she would have been moving up river with the tide at the rate of at least two knots, and no one claims that she was moving up at all. It is probable, however, that at the time of the collision she had about come to a stand-still by land, so that she was really moving through the water at the rate of about two knots. She was, therefore, not drifting, and consequently was not bound to ring her bell instead of sounding her fog-whistle. Immediately after the collision, by which the head of the Jenks had been knocked around to port, probably a couple of points, she started up her engines, and went into the slip between Forty-Fifth and Forty-Sixth streets, and in doing so ran against the string-piece of the Forty-Sixth street pier about 300 feet inside of the slip, and made a considerable cut in it, which left a mark showing an angle of about 45 degrees with the side of the pier.

Considering the special circumstances, I am not prepared to hold either vessel blamable as regards the general plan of navigation she adopted. The Jenks, a freight and passenger vessel, surprised by fog, might lawfully, I think, make her way cautiously along the shore, and within sight of it. The ordinary duty to keep near the middle of the river was not applicable; and, though other and swifter ferry-boats may be able to make directly for the Jersey ferry-slips on a diagonal course, (*The Orange*, 46 Fed. Rep. 411,) I cannot say that the practice of the Midland, whose full speed was only six or seven knots an hour, to hold the New York shore until she got to Sixtieth street, before crossing, was unreasonable or blamable; so that for turning towards the New York shore, in order to keep it in sight after leaving the slip, I cannot hold the Midland out of her course, or in fault.

There only remains the question of the management of each in such thick fog, when each was endeavoring to hold the New York shore. The obligation to use adequate caution to avoid collision was incumbent on both alike. The evidence showed that each was previously running at only half speed, and both stopped their engines when the signal of the other was heard. The Midland, however, did not reverse until the Jenks hove in sight, not 150 feet off, and that was too late to avoid running upon the Jenks, though the latter was going not directly towards her, but at nearly right angles to her course. She might and should have reversed when the Jenks' signal was heard near, as it must have been, and she should not have delayed reversing, headed, as she evidently

was, across the Jenks' course, until the Jenks came in sight. The Jenks is also chargeable with the same fault, in that she did not back at all, as she might and should have done when the signals were heard off Forty-Ninth street. She was then going at the rate of five or six knots, at least, probably 7 knots, through the water, and at collision she was moving through the water at the rate of at least two knots. In a fog so dense that vessels cannot be seen more than 150 feet distant, with fog-whistles sounding so near, it was the duty of both to come to a stand-still in the water as soon as possible, until their respective positions were discovered. *The Britannic*, 39 Fed. Rep. 395, 399, and cases there cited. As each in this respect is chargeable with the same fault, the damages and costs are apportioned. A decree, with an order of reference to compute the damages, may be prepared accordingly.